Zachary MORGAN, Mark Frasier, Born–Allah, Charles Fwilo, Phillip Goggins, and Victor Ortiz, Plaintiffs,

v.

Benjamin J. WARD and Peter Preiser, Commissioner and former Commissioner of New York State Department of Correctional Services; J. Edwin LaVallee, Superintendent of Clinton Correctional Facility; R. Fuller, Lieutenant at Clinton Correctional Facility; S. Dobbs, G. King, and one Ryan, Sergeants at Clinton Correctional Facility; and J. O'Brien, A. Bruso, G. Revette, R. Duprey, L. Velie, C. Martin, M. Martin, B. Huckeba, D. Barber, B. Kennedy, F. Woodward, L. Brooks, S. Rabideau, P. Conley, and one Scavenger, Correctional Officers at Clinton Correctional Facility, Defendants.

No. 75–CV–342.

United States District Court,
N.D. New York.

Nov. 7, 1988.

**1030**

Richard G. Ashworth, New York City, for plaintiffs Morgan, Born–Allah, and Goggins.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, N.Y., for defendants; David B. Roberts and Providence Baker, Asst. Attys. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

■ This action was commenced under 42 U.S.C. § 1983 by six inmates who were incarcerated at Clinton Correctional Facility ("Clinton") in Dannemora, New York in 1974 and 1975. It is alleged that during this period, plaintiffs were held in Clinton's Special Housing Unit 14 ("SHU" or "Unit 14"),[1] a unit in which inmates were separated from the institution's general population for punitive purposes, as a result of findings made at Adjustment Committee Proceedings which were conducted in violation of their procedural due process rights.

Plaintiffs also claim that they were subjected to the use of excessive force by prison guards in the years in question, that prison officials routinely conducted body cavity searches of plaintiffs in violation of their constitutional rights, and that the conditions within Unit 14 violated the eighth amendment's prohibition of cruel and unusual punishments. Compensatory and punitive damages are sought. Plaintiffs have also requested declaratory relief, but because plaintiffs are no longer housed in Unit 14 and because the policies of 1974 and 1975 that are challenged here are no longer in effect, such relief is unavailable in this case. *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 585, 92 S.Ct. 1716, 1717, 32 L.Ed.2d 317 (1972). Three of the plaintiffs named in the caption have discontinued their claims with prejudice. A nonjury trial of the claims of the remaining three plaintiffs—Zachary Morgan, Born–Allah, and Phillip Goggins—was conducted July 13–15, 1987. The following constitutes the court's findings of fact and conclusions of law in accordance with the mandate of Fed.R.Civ.P. 52(a).

## I. BACKGROUND

Plaintiffs were confined in Unit 14 during a period of serious unrest in the New York prison system in the wake of the 1971 uprising at the State's Attica Correctional Facility ("Attica"). Each of the plaintiffs were placed in SHU after Superintendent's Proceedings that the parties agree comported with the requirements of due process. Plaintiff Zachary Morgan had been transferred from Attica to Clinton on February 1, 1974 to serve 45 days in Unit 14;

---

1. A Special Housing Unit is defined by the regulations promulgated by New York's Department of Correctional Services as "[a] cell or a group of cells within a facility, maintained separate and apart from cells used by inmates in the general population, for confinement of inmates who are not in a program that permits them to commingle with the general inmate population." 7 N.Y.C.R.R. § 300.2(b). Special housing units are used for protective detention, administrative detention, and disciplinary detention. *Id.* § 300.3. A correctional facility in New York commonly has a number of special housing units; for purposes of this lawsuit, "SHU" will refer to Clinton's Unit 14. An inmate housed in SHU in 1974 and 1975 was for the most part isolated from his fellow inmates, prohibited from using the correctional institution's recreational facilities or participating in work and educational programs, and afforded only limited exercise and shower privileges. *See id.* § 302.3. Inmates housed in Unit 14 at Clinton were not in "solitary confinement," as that term is ordinarily used, since the cells in SHU faced an open gallery, allowing the inmates confined there to communicate to one another. *See id.* § 330.2(b) & (c).

plaintiff Born–Allah was initially sentenced to 60 days in SHU for the failure to obey an order and was placed in Unit 14 on April 2, 1974; plaintiff Phillip Goggins was ordered confined to SHU for seven days commencing January 27, 1974 after he had become embroiled in a dispute with another inmate and a Clinton correctional officer. Morgan would remain confined in SHU until his transfer to the Green Meadow Correctional Facility on September 7, 1975, a total of 584 days, only 225 of which are attributable to findings made at Superintendent's Proceedings. Born–Allah was housed in Unit 14 for 357 days, only 60 of which are traceable to a Superintendent's Proceeding. Goggins was held in SHU for 213 days, only the initial seven of which were mandated by a determination made after a Superintendent's Proceeding.

Plaintiffs maintain that they were retained in Unit 14 beyond the periods established in Superintendent's Proceedings in violation of their due process rights protected by the fourteenth amendment. Plaintiffs argue that they were falsely accused of violating prison rules in some instances and were written up for frivolous infractions in others by the defendant correctional officers. These disciplinary reports were referred to Clinton's Adjustment Committees, which conducted less formal factual inquiries than were made in Superintendent's Proceedings. Plaintiffs claim they were not given advance notice of the charges made by correctional officers before plaintiffs were required to appear before the Adjustment Committees, that they were not given an adequate opportunity to present evidence concerning the charges levelled against them, and that the Adjustment Committee Proceedings were conducted in a summary manner. As a result of these proceedings, plaintiffs were commonly sanctioned for their alleged misdeeds by having their period of confine-

ment in SHU extended for as many as fourteen days (so-called "keeplock" confinement).[2] In 1974 and 1975, the Adjustment Committees had the discretionary power to extend keeplock for successive fourteen day periods.

Plaintiffs Morgan and Born–Allah also testified that during the time they were housed in SHU they were subjected to abusive and demeaning treatment by the correctional officers named as defendants in this case. For example, plaintiff Morgan attested that prison guards would not allow him to shower unless he "barked like a dog;" Morgan and Born–Allah both stated that the correctional officers would place tags with the names of animals on them over the inmates' cells, implying that the prisoners were akin to animals in a zoo; plaintiffs testified that they were forcibly subjected to unnecessary strip searches; and plaintiffs allege that Clinton's correctional officers commonly sprayed tear gas into their faces under circumstances not warranting the use of tear gas. In addition, each of the plaintiffs complain of separate incidents where excessive force was allegedly applied to them by Clinton's guards. This action was commenced on July 15, 1975.

## II. DISCUSSION

### A. *Eleventh Amendment Immunity*

■ Initially, the court must address defendants' contention that plaintiffs' claims for damages relating to the alleged procedural deficiencies of Clinton's Adjustment Committee Proceedings are barred by the eleventh amendment.[3] The eleventh amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or Citizens or Subjects of any

---

**2.** It appears that the term "keeplock" is ordinarily used to refer to the practice of restricting an inmate to his own room or cell in general population. *See McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983). The parties have used that term in this case to refer to the continuation of an inmate's detention in Unit 14, and the court

will also use the term "keeplock" in reference to this latter practice.

**3.** Congress did not abrogate the states' eleventh amendment immunity in enacting 42 U.S.C. § 1983. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

Foreign State." U.S. Const. amend. XI. The Supreme Court has found that the amendment's "greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority" in Article III of the Constitution. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984) *("Pennhurst II").* Consequently, the amendment's prohibition has been broadened to cover suits against a state by one of its own citizens, *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890), as well as suits in which a state is not named but "is the party in fact." *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *see also Pennhurst II,* 465 U.S. at 101, 104 S.Ct. at 908.[4] For example, an action for damages cannot be maintained against a state official in his official capacity, since a judgment in such an action would "impose[ ] liability on the entity that [the official] represents...." *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985) (quotation omitted).

On the other hand, the eleventh amendment does not preclude damage claims against a state official accused of depriving another of a federal right under the color of state law notwithstanding the fact that the official holds public office, so long as the money sought is to come out of the official's own pocket. *Scheuer v. Rhodes,* 416 U.S. at 237–38, 94 S.Ct. at 1686–87; *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir. 1988). Consequently, when a state official is named as a defendant in a lawsuit, the court must determine whether the claim is made against that official in his personal capacity or his official capacity. *See Kentucky v. Graham,* 473 U.S. at 165–68, 105

S.Ct. at 3104–06; *Shabazz v. Coughlin,* 852 F.2d 697, 700 (2d Cir.1988). The caption of the complaint in this action does not indicate in what capacity defendants are being sued. The court finds that defendants have been sued in their personal capacity. The complaint's demand for money damages, as well as defendants' assertion of qualified immunity to liability under § 1983, which is a personal immunity defense, is evidence that defendants were aware that plaintiffs sought to impose personal liability upon them for the constitutional violations with which they are accused.[5] *See Shabazz v. Coughlin,* 852 F.2d at 700.

With regard to the procedural due process claims, defendants argue that they were carrying out the policies of the State of New York, and thus (it is implied) this action must be deemed an official-capacity suit. Support for this contention is found in *Jones v. Smith,* 784 F.2d 149, 152 (2d Cir.1986). In the more recent case of *Farid v. Smith,* however, the Second Circuit rejected any suggestion that might be contained in *Jones* to the effect that a state official was immune from personal liability for carrying out a state policy that violated federal law. 850 F.2d at 923. In *Farid,* Judge Pierce examined the history of the Supreme Court's interpretation of a state's sovereign immunity and found the Court's decisions are consistent with the maxim that " 'an agent's liability for torts committed by him cannot be avoided by pleading the direction or authorization of the principal.' " *Id.* at 921 (quoting *Pennhurst II,* 465 U.S. at 113 n. 23, 104 S.Ct. at 915 n. 23). Judge Pierce noted that although the Supreme Court has moved away from agency principles in analyzing the eleventh amendment in recent years and instead has focused on federalism concerns, this devel-

---

4. The exception to the general rule for federal constitutional challenges of state statutes and regulations, *see Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), does not apply in the case at bar because plaintiffs' claims for prospective equitable relief have been mooted by subsequent changes in the regulations and procedures that plaintiffs attack.

5. The fact that the State of New York has voluntarily assumed the burden of defending and indemnifying its employees in civil rights suits such as this one "does not transform a personal-capacity action against a state official into an official-capacity action against the state." *Farid v. Smith,* 850 F.2d 917, 923 (2d Cir.1988); *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir. 1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

opment did not undermine the vitality of the Court's older cases discussed in *Farid.* Judge Pierce noted that "the need to reconcile competing interests [of federal and state law] is wholly absent when a plaintiff, alleging that a state official in carrying out state policy has violated federal law, institutes a federal personal-capacity action against the state official," since *"only* the federal interest in the supremacy of federal law is implicated, because the state treasury is not at risk." 850 F.2d at 923. In light of the discussion contained in *Farid,* the court rejects defendants' eleventh amendment argument.

### B. *Res Judicata*

■ Defendants also claim that many of plaintiffs' claims are precluded under the doctrines of res judicata and collateral estoppel. In 1973, a class action was commenced in this court under § 1983 by inmates housed in SHU challenging certain prison regulations and practices. Declaratory and injunctive relief [6] was sought in that action; no demand for money damages was made. In December 1974, the Honorable James T. Foley, then Chief Judge of the Northern District of New York, certified a class consisting of the inmates housed in Unit 14. At that time, plaintiffs Morgan and Born–Allah—but not plaintiff Goggins—were members of this class. On February 17, 1977 Chief Judge Foley issued a memorandum-decision and order disposing of the claims raised in that action. *Frazier v. Ward,* 426 F.Supp. 1354, 1356 (N.D.N.Y. 1977). In that decision, Judge Foley held, among other things, that the manner in which Adjustment Committee Proceedings were conducted at Clinton, at least after amendments to the regulations governing those proceedings became effective May

19, 1975, satisfied the mandates of due process. *Id.* at 1369–70. Clinton's policy of requiring strip searches before inmates confined in SHU were allowed contact with visitors, however, was found violative of those inmates' constitutional rights. *Id.* at 1362–67.

The case at bar was commenced after the certification of the class in *Frazier* and before Judge Foley rendered his decision in 1977. Shortly before trial on this matter was commenced, defendants moved for the dismissal of all of plaintiffs' claims not predicated on the allegations concerning excessive use of force on the ground that they were barred by the doctrine of res judicata.[7] The court reserved decision on defendants' motion at that time, and proceeded with the trial. The court now finds that plaintiff Goggins' claims are not barred by either res judicata or collateral estoppel because he was not a member of the class certified in *Frazier.* The claims of plaintiffs Morgan and Born–Allah are not precluded by the doctrine of res judicata because those plaintiffs were not notified that their membership in the *Frazier* class would foreclose subsequent individual actions for damages arising out of the constitutional violations that were raised or could have been raised in *Frazier.* Collateral estoppel does not bar the claims of Morgan and Born–Allah because the issues actually decided in *Frazier* are not identical to those raised in the present case.

■ The doctrines of res judicata and collateral estoppel [8] are intended to ensure the conclusiveness of the judgments of judicial tribunals and thus allow the accomplishment of "the very object for which civil courts have been established, which is

---

**6.** The request for injunctive relief in that case was subsequently withdrawn. *See Frazier v. Ward,* 426 F.Supp. 1354, 1356 (N.D.N.Y.1977).

**7.** Defendants also argue that plaintiff Morgan's claim of excessive force is barred by the doctrine of collateral estoppel because he was convicted of attempted assault as a result of the incident that gives rise to his excessive force allegations. The preclusive effect that should be given this conviction will be addressed by the court in its discussion of plaintiffs' excessive force claims. *See text, infra* at 1047–48.

**8.** Determination of the preclusive effect to be given an earlier federal court judgment in a subsequent action brought in federal court is governed by federal common law. *Premier Electrical Construction Co. v. National Electrical Contractors Assn.,* 814 F.2d 358, 363–64 (7th Cir.1987); *Fireman's Fund Ins. Co. v. International Market Place,* 773 F.2d 1068, 1069 (9th Cir.1985).

to secure the peace and repose of society by the settlement of matters capable of judicial determination." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Once a final judgment has been entered on the merits of an action, the doctrine of res judicata (claim preclusion) mandates that that judgment be " 'a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' " *Nevada v. United States*, 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2917–18, 77 L.Ed.2d 509 (1983) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1877)); *see also Herendeen v. Champion International Corp.*, 525 F.2d 130, 133–34 (2d Cir.1975). The doctrine of collateral estoppel (issue preclusion) prevents "relitigation of issues actually litigated" in a prior adjudication, provided resolution of that issue was necessary to the prior controversy and the party against whom the doctrine is invoked was a party to the prior controversy. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

Under these estoppel by judgment doctrines, the general rule is that at least some preclusive effect must be given to previous judicial determinations made in cases seeking declaratory relief. *See, e.g., Nevada v. United States*, 463 U.S. at 110, 103 S.Ct. at 2906. Moreover, it is well-established that "a judgment in a properly entertained class action is binding on class members in any subsequent litigation," and that in such cases "[b]asic principles of res judicata ... and collateral estoppel ... apply." *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874, 104 S.Ct. at 2794,

2798, 81 L.Ed.2d 718 (1984). Nonetheless, the preclusive effect to be given a final judgment in a class action in which only declaratory relief was pursued is subject to certain limitations. These limitations are necessitated first, by the circumscribed relief ordinarily obtainable in class actions seeking a declaratory judgment,[9] and second, by the due process problems raised when the judgment preclusion doctrines are applied to class members who were unaware that their membership in the class could foreclose subsequent actions to recover money damages.

Due process considerations prevent the application of res judicata or collateral estoppel to the claims of plaintiff Goggins. As a general rule, "due process require[s] that, where possible, a person should be notified of the existence of a lawsuit before he is bound by a judgment in that lawsuit." *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir.1975) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–75, 94 S.Ct. 2140, 2150–51, 40 L.Ed.2d 732 (1974), and *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). For class actions, this requirement is ordinarily fulfilled through the notice provisions of Fed. R.Civ.P. 23(c) and (d). Such notice is usually not provided, however, until after certification of a proposed class. In the *Frazier* action, Goggins had left the class as defined before certification of the plaintiff class was obtained, and therefore cannot be bound by the disposition of the claims made in that case.

Defendants Morgan and Born–Allah, however, were members of the class as certified by Judge Foley in December 1974; indeed, defendant Born–Allah testified at the trial on the merits in *Frazier*. *See* 426 F.Supp. at 1372. Nonetheless, the court finds that the individual claims made by these defendants in this case are not

---

9. Under 28 U.S.C. § 2202, a court rendering a declaratory judgment pursuant to 28 U.S.C. § 2201 may grant "[f]urther necessary or proper relief based on a declaratory judgment or decree." This is a discretionary power, and it is not unusual for a district court to decline to entertain individual damage claims that could have the effect of rendering a class action for prospective declaratory or injunctive relief unmanageable. *See, e.g., Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985); *Crowder v. Lash*, 687 F.2d 996, 1108–09 (7th Cir.1982).

barred by the doctrine of res judicata. There is authority to the effect that "before a class member may be barred from pursuing an individual claim for damages, he must have been notified that he was required to adjudicate his damage claims as part of a prior class action suit." *Crowder v. Lash,* 687 F.2d 996, 1008 (7th Cir.1982); *see also Wright v. Collins,* 766 F.2d 841, 847–49 (4th Cir.1985); *Norris v. Slothouber,* 718 F.2d 1116, 1117 (D.C.Cir.1983); *Penson v. Terminal Transport Co.,* 634 F.2d 989, 995 (5th Cir.1981). The record does not indicate that any such notice was given defendants Morgan and Born–Allah.[10] Moreover, a number of circuit courts, including our own Second Circuit, have specifically held that prison inmates are not precluded from pursuing claims for damages resulting from allegedly unconstitutional prison conditions by an earlier judgment in a class action in which only declaratory or injunctive relief was pursued. *Wright,* 766 F.2d at 847–49; *Crowder,* 687 F.2d at 1007–09; *Bogard v. Cook,* 586 F.2d 399, 408–09 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979); *Cotton v. Hutto,* 577 F.2d 453, 454 (8th Cir.1978); *Jones–Bey v. Caso,* 535 F.2d 1360, 1361–62 (2d Cir.1976).

In most of the above-cited cases, the plaintiff class had prevailed in the prior class action for declaratory relief, and individual plaintiffs were then permitted to pursue claims for damages resulting from the constitutional deprivations that were the subject of the class action. The argument for affording a judgment in a class action for declaratory relief preclusive effect would seem stronger where the plaintiff class did not prevail on its constitutional claims. In such cases, if claim preclusion is denied, a defendant who had been vindicated in a prior suit could be subjected to a second lawsuit involving the same core of operative facts. This does not, however, appear to be a determining consideration. In *Wright,* the Fourth Circuit appears to have assumed that a district court had rejected a constitutional claim by a plaintiff class, *see* 766 F.2d at 847–48, but found

that an individual class member's subsequent action for damages based on the same constitutional theory was not barred by the res judicata doctrine because that individual "was not notified that participation in the class action would preclude a subsequent individual damage action." *Id.* at 848. In reaching this conclusion the court quoted the Seventh Circuit's observation that it would be inappropriate

> to require an inmate to elect between joining an ongoing class suit and thereby forfeiting his right to seek individual damages, on the one hand, and removing himself from the class (and hence risking exclusion from any equitable relief granted) in order to preserve the possibility of bringing a subsequent damage action, on the other.

*Crowder,* 687 F.2d at 1009 (quoted in *Wright,* 766 F.2d at 848). Under this rationale, the success or failure of the plaintiff class in the prior class action would be irrelevant to the propriety of precluding a subsequent damage action by an individual class member on the same constitutional claim. Accordingly, the court must find that the claims of defendants Morgan and Born–Allah are not precluded as a result of the adverse decision rendered in *Frazier.*

 Although a class member who is not given proper notice of the potential effect of a judgment rendered in a class action for declaratory relief is not barred from bringing a subsequent action for damages by the res judicata doctrine, that class member can be precluded from relitigating an issue decided adversely to him in the class action. *Crowder,* 687 F.2d at 1009–11 & n. 10. An issue necessarily decided in an action for equitable relief can have collateral estoppel effect in a subsequent action for damages. *Parklane Hosiery,* 439 U.S. at 335, 99 S.Ct. at 653. Moreover, the sort of due process problem raised when an individual is bound to an election of remedies he did not knowingly make—which would be the result if a class member is precluded from pursuing money damages by failing to opt out of the class when he

---

**10.** Res judicata is an affirmative defense under Fed.R.Civ.P. 8(c), and consequently the burden

is on defendants to demonstrate its applicability to the case at bar.

had no notice that such a bar would result from his membership in the class—is not present when that individual is bound by factual determinations made in the prior class action. Where, as was the case in *Frazier*, the class was adequately represented, the representatives of the class had every incentive to press their claims vigorously, and adequate "procedural opportunities" were available to the individual class member in the prior class action, there are no strong equitable considerations preventing the application of collateral estoppel. Cf. *Parklane Hosiery*, 439 U.S. at 332, 99 S.Ct. at 652.[11]

In determining whether plaintiffs are precluded from pursuing any of the claims they have made in the present action because of an adverse finding in the prior class action, a three-pronged inquiry must be made:

> [F]irst, whether the issues presented by this litigation are in substance the same as those resolved against the [plaintiffs in the previous action]; second, whether controlling facts or legal principles have changed significantly since the [previous] judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.

*Montana v. United States*, 440 U.S. at 155, 99 S.Ct. at 974. The factual and legal determinations made by Judge Foley in *Frazier* for which preclusive effect is sought primarily involve plaintiffs' proce-dural due process claims. Because the issues resolved in Judge Foley's decision cannot be regarded as substantively identical to the claims made in the present action, the court finds that the doctrine of collateral estoppel does not apply to the findings made regarding disciplinary procedures.[12]

■ In *Frazier*, Judge Foley ruled that the plaintiff class had failed to demonstrate that the disciplinary proceedings conducted at Clinton in 1977 violated their due process rights. 426 F.Supp. at 1369–70. Because the plaintiff class sought only prospective relief, Judge Foley did not address the adequacy of the procedures that were in effect in 1974 and the first half of 1975, the time period relevant to the present action. Effective May 19, 1975, the regulations governing New York's prison disciplinary proceedings were amended. Prior to that date, an inmate could be confined in a special housing unit or segregation unit[13] as a result of conclusions drawn after either Adjustment Committee Proceedings or Superintendent's Proceedings. As a result of the May 19, 1975 amendment, a correctional institution's Adjustment Committees were "deprived ... of the power to confine an inmate to a special housing unit without an immediate recommendation that a Superintendent's Proceeding be convened." *See Powell v. Ward*, 643 F.2d 924, 928 n. 2 (2d Cir.) (per curiam) (*Powell II*), cert. denied, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed. 2d 111 (1981).[14] This is a significant

---

**11.** *Parklane Hosiery* discussed the equitable factors a federal court should weigh in determining whether to allow the "offensive" use of collateral estoppel. Among other things, a court is to determine whether the party against whom the doctrine is to be used had the incentive to fully and vigorously pursue the earlier action, whether the prior judgment relied upon by the party seeking issue preclusion is inconsistent with other previous judgments involving the party against whom the doctrine is to be applied, and whether "procedural opportunities" exist in the action in which preclusion is sought that were not available in the prior action that are "of a kind that might be likely to cause a different result." 439 U.S. at 331–32, 99 S.Ct. at 651.

**12.** Defendants have argued that Judge Foley's disposition of claims implicating the conditions of confinement at Unit 14 foreclosed plaintiffs' challenge to such conditions in this action.

This contention is predicated on a principle applicable only in cases in which res judicata applies. *See Nevada v. United States,* 463 U.S. at 129–30, 103 S.Ct. at 2917–18. Because the court has determined that res judicata is inapplicable in this case, defendants cannot rely on the rule barring plaintiffs from raising claims that could have been raised in the prior action.

**13.** In theory, a segregation unit was distinguishable from a special housing unit by the fact that prisoners held in segregation were not allowed to commingle with one another, while those detained in a special housing unit were allowed some contact with other inmates held in the same unit. 7 N.Y.C.R.R. § 300.2(b) & (c).

**14.** It is not clear that these changes in the regulations were uniformly followed in New York prisons after their promulgation. Plaintiff Morgan was ordered held over in SHU without the

change, because plaintiffs in the present action do not contend that the procedural protections afforded at the Superintendent's Proceedings conducted in 1974 and 1975 failed to satisfy due process requirements. The focus of their due process attack is instead the Adjustment Committee Proceedings. The question raised in the present action is whether the extension of an inmate's period of confinement in special housing after an Adjustment Committee Proceeding conducted pursuant to regulations as they existed in 1974 and 1975—without the benefit of the adequate post-deprivation hearing that was supposedly provided after May 1975 by a Superintendent's Proceeding—comported with due process. Judge Foley did not address this issue in *Frazier*, and thus his disposition of the procedural due process claim in that case does not preclude plaintiffs' due process claims made in the present action.

Judge Foley also ruled that the limitations placed on the access of SHU inmates to library resources did not deny them effective access to the courts. 426 F.Supp. at 1370–72. Plaintiffs protested these limitations in their complaint, but did not present proof regarding this issue at trial. Therefore, it is unnecessary to determine whether plaintiffs should be bound by Judge Foley's resolution of that claim. An argument could be made that preclusive effect should be given to Judge Foley's determination that the body cavity searches routinely conducted by Clinton guards before and after inmates housed in SHU visited individuals from outside the prison violated the fourth and eighth amendments. Collateral estoppel has not been pressed by plaintiffs, however, and the burden would be placed upon them to demonstrate that the doctrine applies in this case.[15] Because neither res judicata nor collateral estoppel apply in the case at bar, the court turns to the merits of plaintiffs' claims.

### C. *The Due Process Claims*

#### 1. *The Adjustment Committee Proceedings*

As a general rule, the resolution of a procedural due process claim requires a determination of whether the plaintiff was deprived of a constitutionally protected interest and, if so, whether the procedures used were adequate given the nature of the deprivation contemplated. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982); *Farid*, 850 F.2d at 924. It is now well established that in New York, when an inmate who was properly placed in a special housing unit for disciplinary reasons is kept in that unit beyond his initial sentence because of additional disciplinary charges, he has suffered a significant deprivation of a protected liberty interest created by state law. *See McCann v. Coughlin*, 698 F.2d 112, 121–22 (2d Cir.1983). Consequently, due process requires that certain minimal procedural protections be afforded in order to assure a more reliable evaluation of the factual basis of the additional charges made and a fairer determination of the punishment warranted by the inmate's behavior. *See, e.g., Hewitt v. Helms*, 459 U.S. 460, 470–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 555–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974); *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir.1984).

To determine the specific requirements of due process in a particular case, a court must consider the interest of the private individual at issue, the risk that an erroneous deprivation of the private interest will occur because of the procedures being used, the benefits that might result from additional or alternative procedural safeguards, and the governmental interests, including fiscal and administrative concerns, that are implicated. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47

---

benefit of a Superintendent's Proceeding on several occasions after May 19, 1975. In *McCann v. Coughlin*, 698 F.2d 112 (2d Cir.1983), the Second Circuit addressed a procedural due process challenge to keeplock in a special housing unit after the aggrieved inmate had been afforded only a hearing before the Adjustment Committee. That challenge arose out of events occurring in 1979.

**15.** In any event, the court agrees that Clinton's body cavity search policy violated plaintiffs' fourth amendment rights. *See text, infra* at 1051–54.

L.Ed.2d 18 (1976). In *Wolff v. McDonnell,* the Supreme Court balanced the interests at stake when a prisoner faces disciplinary charges that can result in significant deprivations of liberty interests. The Court decided that in such cases the inmate must be provided a hearing conducted by a fair and impartial factfinder on the charges levied against him and is entitled to be informed in writing of those charges at least twenty-four hours before that hearing. 418 U.S. at 563–64, 94 S.Ct. at 2978–79; *id.* 418 U.S. at 581, 94 S.Ct. at 2987 (Marshall, J., concurring in part and dissenting in part). The inmate must be allowed to present evidence and call witnesses in his defense if this can be done without imperilling institutional safety or legitimate correctional objectives. *Id.* at 566, 94 S.Ct. at 2979. Further, he must be informed of the reasons for the actions taken against him as a result of the disposition of the disciplinary charges by the factfinder and the evidence relied upon by the factfinder in reaching its decision. *Id.* at 563–65, 94 S.Ct. at 2978–79; *see also McCann,* 698 F.2d at 121–22. Plaintiffs maintain they were not afforded these basic procedural safeguards in hearings that resulted in the extension of their confinement in SHU.

 During the period of time relevant to this lawsuit, the two major types of disciplinary proceedings conducted in New York correctional facilities were Superintendent's Proceedings and Adjustment Committee Proceedings. 7 N.Y.C.R.R. Parts 252, 253.[16] Superintendent's Proceedings were wholly disciplinary in purpose, 7 N.Y.C.R.R. § 253.1, and plaintiffs do not challenge the procedural adequacy of those Proceedings.[17] In contrast, prison officials considered Adjustment Committee

Proceedings[18] to be less formal hearings designed to aid an inmate's "understanding of and adherence to" the institution's rules governing his behavior; the Adjustment Committees were not to "impos[e] punishment for a violation" of those rules. 7 N.Y.C.R.R. § 252.5(a) & (b); *see Powell II,* 643 F.2d at 928 n. 2; *Powell v. Ward,* 392 F.Supp. 628, 629 (S.D.N.Y.1975) (*Powell I*), *aff'd as modified,* 542 F.2d 101 (2d Cir. 1976). The Committees were vested with primary responsibility for ascertaining the facts and circumstances of alleged incidents of inmate misbehavior in the prisons of the State of New York, and were charged with taking "appropriate steps to secure future compliance" with institutional rules. 7 N.Y.C.R.R. § 252.2(c). Corrections officials apparently believed that the "steps" the Adjustment Committees were permitted to take implicated comparatively minor private interests, and consequently the procedural safeguards associated with the Superintendent's Proceedings, much less those mandated by *Wolff,* were not provided by authorities at Clinton when an inmate appeared before that institution's Adjustment Committees.

Clinton officials misperceived the magnitude of the deprivations that could result from determinations by its Adjustment Committees. If deemed "necessary in order to bring the behavior of the inmate within acceptable limits," a Committee could continue an inmate's confinement in SHU for a period as long as fourteen days, and it could do this on successive occasions. *Id.* § 252.5(e). In the case at bar, Clinton's Committees regularly extended plaintiffs' period of confinement in SHU for successive seven day periods. This power was

---

**16.** All allusions to the New York Code of Rules and Regulations in this opinion refer to the regulations in force before May 19, 1985, unless the text suggests otherwise. The disciplinary system in place in 1974 has been replaced by a three-tier disciplinary system.

**17.** *But see Powell v. Ward,* 392 F.Supp. 628, 631–32 (S.D.N.Y.1975) (*Powell I*), *aff'd as modified,* 542 F.2d 101 (2d Cir.1976).

**18.** The Adjustment Committees, which were established through regulations promulgated by

the New York State Department of Correctional Services, *see* 7 N.Y.C.R.R. § 252.1, consisted of three employees of the penal institution designated by the prison's superintendent. At Clinton, these committees were commonly manned by a lieutenant at the institution, a correctional officer, and a civilian employee. The correctional officer or other employee who reported the incident of inmate misconduct that was the subject of an Adjustment Committee proceeding would not be allowed to sit on the Committee considering that incident.

exercised without routinely giving inmates written notice of the charges they faced in the Adjustment Committee Proceedings or providing inmates written findings when the Committee decided to continue punitive confinement. Plaintiffs testified that they did not believe that they could, under certain circumstances, call witnesses to testify at these hearings. In *McCann*, the Second Circuit conclusively determined that the procedural safeguards set out in *Wolff* must be provided to an inmate who faces the prospect of being sentenced to additional time in a punitive special housing unit beyond the sentence established after a Superintendent's Proceeding. 698 F.2d at 121. Since those safeguards were not provided plaintiffs in 1974 and 1975, the court concludes that plaintiffs procedural due process rights were infringed when keeplock was imposed for successive seven day periods pursuant to the discretionary authority of Clinton's Adjustment Committees.

### 2. *Good Faith Immunity*

■ Having determined that the manner in which the Adjustment Committee Proceedings were conducted in 1974 and 1975 violated plaintiffs' procedural due process rights, the court must determine whether defendants are entitled to immunity from civil damages in this § 1983 action. Generally speaking, state officials, including state prison officials, *see Procunier v. Navarette*, 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978), are shielded from liability under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982); *see also Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Shabazz v. Coughlin*, 852 F.2d at 700. On the other hand, if the constitutional or statutory law at issue was clearly established at the time it was violated, the state official who violated it is not, absent extraordinary circumstances, protected by the qualified immunity defense. *Harlow*, 457 U.S. at 818–19,

102 S.Ct. at 2738–39; *Walsh v. Franco*, 849 F.2d 66, 68 (2d Cir.1988).

Plaintiff Morgan was held in Unit 14 between February 1974 and September 1975. With the exception of the initial 45 days of this confinement and three separate 60 day periods commencing in August 1974, January 1975, and April 1975, Morgan's confinement in SHU resulted from determinations made at Adjustment Committee Proceedings. Plaintiff Born–Allah was placed in SHU in April 1974 and remained there until the end of March 1975; all but the initial 60 days of this time was mandated by Clinton's Adjustment Committees. Plaintiff Goggins was housed in SHU between January and August 1974, and only the first week of that time is not attributable to an Adjustment Committee determination. In order to resolve defendants' qualified immunity argument, the court must determine whether the Adjustment Committee procedures offended due process principles that were "clearly established" at any point during the periods in which plaintiffs were housed in Unit 14.

The Second Circuit did not decide the exact issue presented in the present case until 1983, when it handed down its decision in *McCann*. Nonetheless, the lack of "specific authority directly on point" in 1974 and 1975 does not absolutely "preclude a finding that the law was clearly established." *Shabazz*, 852 F.2d at 701; *see also Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). Although prison officials have no duty to "anticipate future developments in the field of inmates' due process rights," they cannot restrict their reading of previously decided cases "to the particular facts presented to the court in those cases, and claim that the details of the present situation are different in some minor or insignificant way." *McCann*, 698 F.2d at 125. In *McCann*, the Second Circuit rejected the contention that prison officials were entitled to good faith immunity for due process violations found to have occurred in Adjustment Committee Proceedings conducted in New York's Fishkill Correctional Center in

1979. *Id.* at 124–25.[19] In *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), the court found that the *Wolff* procedures applied when an inmate was to be restricted to his cell in general population for punitive purposes (a punishment similar to but probably less severe than that at issue in *McCann*), but refused to permit damages for the failure to provide these procedures in 1973, before *Wolff* had been decided, because at that time "the contours of prisoners' procedural rights were just starting to take shape." 568 F.2d at 934–35. The question here is whether principles that were unclear in 1973 but crystallized by 1979 were "clearly established" in 1974 or 1975.

The court begins by noting that the leading prisoners' due process case in this Circuit before *Wolff* was *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971) (en banc), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 & 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The key passage in that opinion concerning the procedural due process requirements for prison disciplinary actions was as follows:

> If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, and afforded a reasonable opportunity to explain his actions.

*Id.* at 198 (citations omitted). This is precisely the process provided plaintiffs at the Adjustment Committee Proceedings in 1974 and 1975. At that time, an inmate was given oral notice of the charges against him at the hearing, advised of the evidence supporting the charges, and given an opportunity to contest the allegation or explain his behavior. The court concludes that the Adjustment Committee Proceedings satisfied *Sostre*.

On June 26, 1974 the Supreme Court issued its decision in *Wolff*. The Court implicitly found that the procedural safeguards contemplated by *Sostre* were not sufficient when serious deprivations for disciplinary infractions were contemplated, *see* 418 U.S. at 563–72 & 572 n. 20, 94 S.Ct. at 2978–82, & 2982 n. 20, and prescribed the requirements described above. *See* text, *supra* at 1037–38. *Wolff* involved sanctions such as the loss of good behavior time and solitary confinement. The Court noted, however, that "the [d]ue [p]rocess [c]lause does not require a hearing 'in every conceivable case of government impairment of private interest,'" 418 U.S. at 557, 94 S.Ct. at 2975 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)), and explained that it did not intend to intimate that the procedures that must be followed when the loss of good time (which effectively extended an inmate's actual period of incarceration) or the imposition of solitary confinement were threatened are the same as would "be required for the imposition of lesser penalties such as the loss of privileges." *Id.* 418 U.S. at 571 n. 19, 94 S.Ct. at 2982 n. 19. New York's prison officials apparently believed that the extension of keeplock in SHU for a period not exceeding fourteen days was the sort of "lesser penalty" contemplated by *Wolff*'s footnote 19. If so, this belief was not objectively reasonable.

Before the Supreme Court's decision in *Wolff*, there was substantial authority both within this Circuit and elsewhere to the effect that the placement of an inmate in a special housing unit constituted a "substantial deprivation" or "grievous loss." Some

---

**19.** In determining that the due process principles violated by the procedures followed by the Adjustment Committees were "clearly established," the Second Circuit cited the following decisions: *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Mawhinney v. Henderson*, 542 F.2d 1 (2d Cir.1976); *Crooks v. Warne*, 516 F.2d 837 (2d Cir.1975); *United States ex rel. Walker v. Mancusi*, 467 F.2d 51 (2d Cir.1972); and *Powell I*, 392 F.Supp. 628 (S.D.N.Y.1975), *aff'd as modified*, 542 F.2d 101 (1976).

of those cases are listed in the margin.[20] For example, in *United States ex rel. Walker v. Mancusi*, 338 F.Supp. 311 (W.D. N.Y.1971), *aff'd*, 467 F.2d 51 (2d Cir.1972), Judge Curtin found that confinement in a special housing unit apart from an institution's general population was a "punishment sufficiently severe" to require minimum procedural safeguards. 338 F.Supp. at 314. By affirming, the Second Circuit impliedly adopted this conclusion.[21] 467 F.2d at 53–54. The fact that the Adjustment Committee Proceedings afforded the process required by *Sostre* during this period is some evidence that the seriousness of the extension of an inmate's confinement in SHU was recognized by correctional officials. Consequently, it could be argued that when the *Wolff* decision was issued, prison officials should have been aware that the *Sostre* procedures would no longer be sufficient, particularly given the *Wolff* Court's implicit rejection of the adequacy of the procedural requirements suggested by *Sostre* for cases involving serious deprivations. *See* 418 U.S. at 572 n. 20, 94 S.Ct. at 2982 n. 20.[22]

20. Cases from this Circuit included *United States ex rel. Walker v. Mancusi,* 338 F.Supp. 311 (W.D.N.Y.1971) (confinement in Attica's special housing unit in wake of Attica riots involved "harsh reduction" of privileges, and thus cannot be imposed absent minimum procedural safeguards; *Sostre* procedures deemed adequate), *aff'd,* 467 F.2d 51 (2d Cir.1972); *Carter v. McGinnis,* 320 F.Supp. 1092 (W.D.N.Y.1970) (holding inmates in segregation unit without charges being filed against them and without informing them of reasons for such confinement violated inmates' due process rights); and *Kritsky v. McGinnis,* 313 F.Supp. 1247, 1250–51 (N.D.N.Y.1970) (Foley, J.) (lost good behavior time and segregation, which were deemed "grievous loss[es]," cannot be imposed in absence of hearing before impartial decision maker, and decision maker should state his reasons for imposing punishment), *aff'd sub nom. Rodriguez v. McGinnis,* 456 F.2d 79 (2d Cir.1972), *rev'd on other grounds sub nom. Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Cases from outside the Second Circuit included *United States ex rel. Miller v. Twomey,* 479 F.2d 701, 716–19 (7th Cir.1973) (Stevens, J.) ("prolonged segregated confinement is a 'grievous loss'" implicating due process concerns), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Diamond v. Thompson,* 364 F.Supp. 659, 664 (M.D.Ala.1973) (Johnson, J.) ("withdrawal of privileges or the imposition of more burdensome conditions of confinement may constitute a grievous loss calling for procedural standards"); *Sands v. Wainwright,* 357 F.Supp. 1062, 1082 (M.D.Fla.) ("those conditions of human existence which accompany confinement in [disciplinary] segregation ... constitute [a] grievous loss[ ] ..."), *vacated on other grounds,* 491 F.2d 417 (5th Cir.1973); and *Bundy v. Cannon,* 328 F.Supp. 165, 172–74 (D.Md. 1971) ("protracted segregated confinement in maximum security quarters" constituted "punishment sufficiently severe to require [that] minimum due process standards [be met];" those standards included written notice of charges prior to hearing).

21. So found the court in *McKinnon,* 568 F.2d at 937.

22. After discussing the minimum procedures that the Supreme Court found should be provided in disciplinary proceedings implicating serious liberty interests, the Court observed in a footnote that the circuit courts had been split on this issue. 418 U.S. at 572 n. 20, 94 S.Ct. at 2982 n. 20. Among the cases discussed were *Sostre* and *United States ex rel. Miller v. Twomey,* 479 F.2d 701 (7th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974), an opinion written by Justice Stevens in 1973, when he was still a circuit court judge for the Seventh Circuit. In *Miller,* Judge Stevens noted that the Seventh Circuit, in *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971), had followed the Second Circuit's position in *Sostre* and held that "if a 'prisoner is confronted with the accusation against him and afforded a reasonable opportunity to deny the accusation or explain his actions' before confinement in segregation, 'this would appear to fairly and rationally satisfy the concept of procedural due process.'" *Miller,* 479 F.2d at 717 (quoting *Adams,* 445 F.2d at 108). Subsequent to both *Sostre* and *Adams,* the Supreme Court decided *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which involved the due process requirements for parole revocation proceedings. The *Miller* court concluded that the reasoning of *Morrissey* brought into question its earlier decision in *Adams.* 479 F.2d at 712. Reexamining the question of what process is due in prison disciplinary proceedings, Judge Stevens concluded that an inmate is entitled to "an adequate and timely written notice of the charge, a fair opportunity to explain and to request that witnesses be called or interviewed, and an impartial decision maker." *Id.* at 718. These procedural safeguards, of course, were very similar to those mandated by *Wolff. Morrissey,* the case relied on in large part in *Miller,* provided an important underpinning to the Supreme Court's opinion in *Wolff* a year later. By comparing *Miller* and *Sostre* in that footnote, adopting procedures similar to those required by *Miller,* and relying to a large extent on the same case which influenced *Miller's* rejection of *Adams* and *Sostre,* the Supreme Court impliedly rejected the

The court recognizes that the *Wolff* Court's distinction between the substantial deprivations at issue in that case and "lesser penalties" was somewhat ambiguous and may have caused some confusion. If there was any doubt when the *Wolff* decision was rendered, however, that doubt should have evaporated after a series of cases from courts in the Second Circuit within a year of *Wolff* established that the *Wolff* procedures (rather than those suggested in *Sostre* ) were to be used when a substantial liberty deprivation was threatened. In *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2d Cir.1975), the court stated in dicta that if *Wolff* were to be applied retroactively, it would govern the procedural safeguards that must be provided before an inmate can be removed from a prison's general population and placed in a special housing unit. *Id.* at 586–87. *Larkins* was decided on January 24, 1975. On April 23 of that same year, Judge Stewart reached the same conclusion in *Powell I.* 392 F.Supp. at 630. Judge Stewart, in turn, relied in part on a decision in a similar case by Judge Brieant of the Southern District of New York issued several months before. *Crooks v. Warne,* 74 Civ. 2351 (S.D.N.Y.1974), *aff'd in part and vacated in part,* 516 F.2d 837 (2d Cir.1975). The *Crooks* decision was vacated by the Second Circuit on May 22, 1975 because the court felt that the relief prescribed by Judge Stewart in *Powell I* should be adhered to in the interest of uniformity. The Second Circuit implicitly recognized in that case, however, that hearings at which "special custodial confinement" might be imposed must be conducted in accordance with *Wolff.* 516 F.2d at 839.

Pinpointing the exact date when defendants reasonably should have known that the principle explicitly enunciated in *McCann* became "clearly established" is difficult. The court believes that by the time the Supreme Court's opinion in *Wolff* was supplemented by Judge Brieant's decision in *Crooks* and the Second Circuit's decision in *Larkins,* Clinton officials reasonably should have known that confine-

ment in SHU was a deprivation of such magnitude that the procedural minima mandated by *Wolff* must be met. This would make January 24, 1975 the date upon which defendants could no longer rely on good faith immunity.

This conclusion is not undermined by the fact that the Adjustment Committees only *extended* an inmate's period of confinement in SHU because of rule infractions committed while the inmate was held in SHU, and thus did not *change* an inmate's living situation. It is true that most of the cases cited above involved questions concerning the process that was due when an inmate was to be removed from the general population and placed in a special housing unit or segregation for disciplinary reasons. However, the court finds no rational distinction, at least insofar as the requirements of procedural due process are concerned, between an extension of special housing beyond the period originally specified at a Superintendent's Proceeding and an inmate's initial placement in special housing. The liberty interest at stake remains the same: the inmate's interest in being housed in the less austere environs of the prison's general population. Indeed, *Crooks* involved a challenge to procedures utilized in continuing an inmate's confinement in a special housing unit. 516 F.2d at 839.

The result reached in this case is not changed by the fact that prison officials did not intend to impose significant punitive sanctions through Adjustment Committee Proceedings. "The test cannot be based upon the motives of prison officials, but must rely upon the effect of the more restrictive confinement on the inmate." *Diamond v. Thompson,* 364 F.Supp. 659, 664 (M.D.Ala.1973). The fact that an inmate would have his time in special housing extended by only one week at a time does not support an argument that Adjustment Committees only imposed "lesser sanctions," since the Adjustment Committees had unlimited power to extend such confinement in successive seven-day terms. Indeed, plaintiffs themselves were retained

*Sostre* procedures. In light of this, defendants' reliance on *Sostre* after *Wolff* seems imprudent.

in SHU for several months through successive extensions by Clinton's Adjustment Committees. The disciplinary history of plaintiffs belie any good faith contention on the part of defendants that the short duration of any single sanction took Adjustment Committee Proceedings outside the scope of the *Wolff* decision.

There are cases from the mid- to late–1970s in which Adjustment Committee procedures were upheld in the face of procedural due process attacks. In 1977, the New York Court of Appeals found that "[s]ince no sanction more severe than the loss of minor privileges can result from adjustment committee action, strict full due process standards need not be met in these informal proceedings." *Amato v. Ward,* 41 N.Y.2d 469, 472–73, 393 N.Y.S.2d 934, 937, 362 N.E.2d 566, 569 (1977); [23] *see also Flaherty v. Fogg,* 72 A.D.2d 861, 421 N.Y.S.2d 736 (3d Dept.1979), *appeal denied,* 48 N.Y.2d 612, 425 N.Y.S.2d. 1028, 402 N.E.2d 144 (1980). In *Frazier v. Ward,* Judge Foley found that the procedures afforded in disciplinary hearings within New York prisons did not offend due process. 426 F.Supp. at 1369–70. A close reading of these cases reveals that these courts were assessing the constitutionality of prison disciplinary proceedings as they should have been conducted after amendments made to the regulations governing New York's correctional facilities became effective on May 19, 1975. In *Amato,* the Court of Appeals summarized these regulations (as amended) and concluded that inmates in New York prisons "received, with regard to all discrete charges of misconduct, procedural protections in excess of those mandated by the *Wolff* doctrine." 41 N.Y.2d at 473, 393 N.Y.S.2d at 937, 362 N.E.2d at 570. In *Frazier,* Judge Foley similarly determined that the relevant regulations, as

amended May 19, 1975, comported with the requirements of *Wolff.* 426 F.Supp. at 1370. The proof in the present case clearly indicates that the regulatory framework discussed in *Amato* and *Frazier* was not followed at Clinton in the period of time relevant to plaintiffs' claims. Consequently, these cases do not alter the court's conclusion that correctional officials in New York should have known by the Winter of 1975 that the imposition of keeplock confinement by Clinton's Adjustment Committees offended due process.[24]

In sum, the court finds that defendants are not entitled to good faith immunity after January 24, 1975. Plaintiffs Morgan and Born–Allah were confined in Unit 14 after that date as a result of Adjustment Committee Proceedings conducted in violation of the Constitution's due process clause. Plaintiff Goggins, on the other hand, left Unit 14 in August 1984 (shortly after the Supreme Court's decision in *Wolff*), and with respect to his procedural due process claim defendants are entitled to qualified immunity from liability.

### 3. *Relief*

■ Section 1983 codifies " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution," *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976)), and consequently the level of damages awarded for the violation of constitutional rights under § 1983 is determined, for the most part, by reference to principles gleaned from the common law of torts. *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986). To obtain an

**23.** *Amato* involved a challenge to the procedures followed by the New York Time Allowance Committees in calculating an inmate's "good time" allowances. The amount of "good time" credited to an inmate determined in part his conditional release date. The Court of Appeals held that the Time Allowance Committees were not "disciplinary" committees subject to the requirements of *Wolff.* Because the Time Allowance Committees based their calculation

of an inmate's "good time" on findings made by disciplinary committees such as the Adjustment Committees, however, the court was required to examine the constitutionality of the manner in which disciplinary charges were handled within New York's prisons.

**24.** *But see Salahuddin v. Harris,* 657 F.Supp. 369, 374–76 (S.D.N.Y.1987).

award of compensatory damages under § 1983, a plaintiff must show that he has suffered an actual injury and that there is a causal connection between that injury and the deprivation of a federal right caused by the defendant. *Carey v. Piphus,* 435 U.S. 247, 262–64, 98 S.Ct. 1042, 1051–53, 55 L.Ed.2d 252; *see also Stachura,* 106 S.Ct. at 2542–45; *McCann,* 698 F.2d at 126. In this case, the injury suffered by plaintiffs Morgan and Born–Allah was their continued confinement in SHU. The procedures afforded plaintiffs Morgan and Born–Allah in the Adjustment Committee Proceedings were constitutionally defective in three particulars: plaintiffs were not given written advance notice of the charges against them, were not informed of their qualified right to call witnesses, and were not provided a written statement from the Committees explaining the actions taken and disclosing the evidence relied upon in deciding to take that action. Determining whether there is a causal relationship between these deficiencies and plaintiffs' injuries is not an easy matter in this case, particularly in view of the long period of time that has elapsed since the occurrence of the events germane to this lawsuit. The court will examine the circumstances surrounding the punishment of Morgan and Born–Allah in turn.

■ Morgan's disciplinary record reveals that between January 24, 1975 and his transfer from Unit 14 in September 1975, he refused to leave his cell to attend Adjustment Committee Proceedings. Morgan testified that he felt that the Adjustment Committee was a "kangaroo court" that perfunctorily credited false or trivial charges made by Clinton's correctional officers. There is no evidence that this opinion had a basis in fact. Although the Adjust-

ment Committee Proceedings failed to satisfy the *Wolff* requirements, they hardly constituted a mockery of justice. Indeed, the procedural safeguards provided satisfied *Sostre,* a well-considered opinion by Judge Kaufman speaking for a majority of the Second Circuit sitting *en banc. See* 442 F.2d at 194–99. Moreover, the court rejects Morgan's contention that the disciplinary charges made against him were either false or trivial.[25] Consequently, Morgan's voluntary decision to refuse to meet with the Adjustment Committee was unjustified. Without deciding whether there may be circumstances under which the exhaustion of the disciplinary procedures available to an inmate would not be required before he would be allowed to challenge disciplinary charges in a judicial forum, the court finds that under the circumstances of the present case Morgan's failure to contest the charges made against him through the Adjustment Committee Proceedings provided precludes him from challenging in federal court the factual basis those charges. To allow Morgan to challenge the charges after he unjustifiably refused to comply with established administrative procedures would undermine respect for all of the administrative mechanisms established by the State of New York for resolving disputes within its penal institutions. The court will not go down this road, and will assume that the charges made against Morgan are supported in fact. *Cf. Hasan Jamal Abdul Majid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D. N.Y.) (failure of inmate to request that witnesses be called to testify at disciplinary hearing prevented inmate from challenging failure of Adjustment Committee to call witnesses under due process clause), *aff'd mem.,* 714 F.2d 115 (2d Cir.1982); *see also Wolfe v. Carlson,* 583 F.Supp. 977, 983

---

**25.** At trial, Morgan admitted that he committed many of the rule violations for which he was cited. For example, Morgan concedes that he repeatedly destroyed state property by tearing down nametags placed over his cell, that he repeatedly refused to shave and shower, and that he consistently refused to attend Adjustment Committee hearings (which at the time was itself a rule violation). Morgan indicated that he refused as a "matter of principle" to place his arms through the bars of his cell prior

to having his cell door opened, as was required by institutional rules for reasons of safety. Admittedly, most of the violations Morgan committed arose out of conduct that outside of the prison context would hardly raise eyebrows. Nonetheless, the regimentation contemplated by detailed institutional rules is vital to the maintenance of order in a correctional facility. Morgan's refusal to follow those rules was unjustified, and it was reasonable that this failure result in disciplinary charges.

(S.D.N.Y.1984) ("Plaintiff cannot turn his own lack of diligence into a constitutional deprivation").

██ Deeming the charges made by correctional officers during the period following January 24, 1975 to be true, the court concludes that the punishment dispensed—continued confinement in SHU—was fair and appropriate. Therefore, Morgan suffered no actual injury as a result of the deficiencies in the Adjustment Committee Proceedings, and is not entitled to compensatory damages. Morgan is entitled to nominal damages and an award of attorney fees for the deprivation of his "absolute" right to procedural due process. *See Carey v. Piphus,* 435 U.S. at 266, 98 S.Ct. at 1053 (citing cases).

██ Plaintiff Born–Allah was confined in SHU from January 24, 1975 until the end of March of that same year without the benefit of a hearing that met the procedural requisites of *Wolff.* In that period, there were eight occasions in which keeplock confinement was imposed after Born–Allah appeared before Clinton's Adjustment Committees. The record indicates that at only one of those appearances did plaintiff admit to the charges made against him.[26] Because of the procedural shortcomings attending the hearings plaintiff was provided on the seven remaining occasions that he appeared before the Adjustment Committees, the court cannot assume that Born–Allah committed the rule violations with which he was charged but to which he had not confessed between January 21, 1975 (the date of the last Adjustment Committee Proceeding conducted by prison officials in objective good faith) and March 25, 1975. Largely because of the substantial amount of time that has

elapsed since these disciplinary reports were made, the testimony at trial did not adequately establish that plaintiff committed these violations. It is unlikely that providing plaintiff a new hearing conforming with the requirements of *Wolff* at this time would effectively resolve whether the violations were fairly attributable to Born–Allah or whether the punishment meted out for those violations, if they occurred, was appropriate. In light of this, the court concludes that plaintiff Born–Allah suffered actual injury that resulted from the denial of his procedural due process rights, and is entitled to $750 in compensatory damages. *Compare Larkins,* 510 F.2d at 589 (jury award of $1,000 was "not 'so grossly excessive as to shock the judicial conscience'" in a case where an inmate was held in segregation for twelve days in violation of *Sostre* ).

██ Plaintiffs have sought punitive damages. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court held that punitive damages are available in § 1983 actions when one party has maliciously or wantonly deprived another of a federal right. *Id.* 461 U.S. at 51, 103 S.Ct. at 1637. Plaintiffs allege that Clinton's guards maliciously made false or frivolous disciplinary charges against them which could not be effectively disputed at the Adjustment Committee hearings that were provided. The court rejects plaintiffs' contention that Clinton's correctional officers purposefully made unwarranted disciplinary charges against plaintiffs. Plaintiffs conceded that they had committed many of the rule infractions with which they were charged in their testimony at trial.[27] The court accepts the testimony of Clinton's correctional officers regarding other rule violations committed by plain-

---

**26.** Plaintiff admitted to six rule violations at the Adjustment Committee hearing conducted on February 11, 1975. One week of keeplock confinement was an appropriate sanction for those violations.

**27.** For example, plaintiffs did not dispute that they destroyed state property by tearing down nametags that were placed over their cells, that

they refused to meet with the Adjustment Committees on occasion, or that they refused to rinse their bowls and eating utensils upon completing their meals, as required by Clinton's institutional rules. Plaintiffs also admitted that they refused to shave and shower on occasion. The justifications offered by plaintiffs for these infractions were either unreasonable or lacked credibility.

tiffs.[28] Further, although the procedures utilized in Clinton's Adjustment Committee Proceedings were inadequate, the court finds no evidence that these deficiencies resulted from an intention on the part of correctional officials to deny inmates housed in SHU their due process rights, nor were they designed as a pretext for unfairly punishing unpopular inmates. Therefore, punitive damages will not be awarded.[29]

■■■ Plaintiffs Morgan and Born–Allah have "succeed[ed] on [a] significant issue" in this § 1983 action by "achiev[ing] some of the benefit [they] sought in bringing suit," and thus are "prevailing parties" within the meaning of 42 U.S.C. § 1988. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). When a plaintiff is a prevailing party within the meaning of § 1988, he is entitled to an award attorney fees absent " 'special circumstances which would render such an award unjust.' " *Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986) (quoting *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam)), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). No such special circumstances exist here, and thus the court will entertain an application from plaintiffs' attorney for work reasonably expended on plaintiffs' procedural due process claims.

■■■ Finally, although the issue is largely academic given the State of New York's policy of indemnifying its public servants for torts committed while in the course of their public employment, *see* N.Y. Pub.Off.Law §§ 17 and 18 (McKinney 1988), the court must determine which of the defendants is liable for the damages sustained by plaintiffs Morgan and Born–Allah. A defendant cannot be held liable for damages under § 1983 unless he was personally involved in the deprivation of the plaintiff's rights under federal law. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987); *McKinnon v. Patterson,* 568 F.2d at 934. Initially, the court has rejected the contention that plaintiffs were the victims of a conspiracy among Clinton's correctional officers to file false or frivolous disciplinary reports against them, and thus there was no personal involvement on the part of the individual correctional officers in the deprivation of plaintiffs' due process rights. The requisite personal involvement on the part of defendant Ronald Fuller, in 1974 and 1975 Clinton's Safety and Security Lieutenant in charge of the conduct of Clinton's disciplinary hearings, does exist and thus he is liable under § 1983. Defendants Benjamin Ward, New York's Commissioner of Correctional Services in 1975,[30] and J. Edwin LaVallee, Clinton's Superintendent, are also liable. A supervisory official may be liable under § 1983 when he "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue," or when he learned of a constitutional violation through a report or an appeal and failed to remedy the violation. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Both Ward and LaVallee can fairly be charged with constructive notice of the Adjustment Committee procedures that were employed at Clinton. *See McCann,* 698 F.2d at 125.

### D. *Use of Force*

Each of the plaintiffs allege that they were subjected to the use of excessive force by Clinton's correctional officers on separate occasions. Plaintiff Morgan testified that he was attacked without provocation by at least six correctional officers as he was returning to his cell after showering on August 15, 1974. Plaintiff Goggins claims that three days later, he was beaten

---

**28.** Specifically, the court believes the testimony of correctional officers concerning use of force incidents involving each of the plaintiffs. *See* text, *infra* at 1046–51. The court also disbelieves plaintiff Morgan's testimony concerning his physical assault of a prison counsellor.

**29.** Similarly, there is no evidence supporting plaintiffs allegation that defendants conspired to deprive plaintiffs of their due process rights.

**30.** Former Commissioner Peter Preiser did not hold that office at any point where defendants were not entitled to qualified immunity for the due process violations.

by eight correctional officers as he was leaving the showers. Plaintiff Born–Allah testified that on November 9, 1974 he was struck in the head with an ax handle by Correctional Officer Clifford Martin and beaten by other correctional officers while a search of his cell was being conducted. Defendants admit that force was applied by correctional officers in each of these incidents (though they maintain that the force used was not as great as plaintiffs claim), but contend that the force used in each case was a reasonable and justifiable response to violent attacks initiated by plaintiffs.

The assessment of an inmate's allegation of the excessive use of force by correctional personnel is controlled by Judge Friendly's definitive analysis in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). There, Judge Friendly posited that the Supreme Court's decision in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), stood for the principle "that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law," 481 F.2d at 1032, and that this same principle extended "to acts of brutality by correctional officers." *Id.* at 1033.[31] Judge Friendly noted that the violent realities of this nation's correctional facilities must be taken into account in formulating a standard by which to determine whether correctional officers at these facilities have engaged in "conduct that shocks the conscience" or "offend[s] even hardened sensibilities," *see Rochin,* 342 U.S. at 172, 72 S.Ct. at 209, and, conscious of these realities, he set out a nonexhaustive list of factors to be considered in assessing excessive force claims:

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033; *see also Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988). With this guideline in mind, the court will examine the circumstances surrounding each of the incidents at issue in this case, taking them in chronological order.

### 1. *The August 15, 1974 Incident Involving Plaintiff Morgan*

 Plaintiff Morgan testified that on August 15, 1974, he was the victim of an unprovoked attack by some of Clinton's correctional officers while returning to his cell in SHU after showering. He stated that Correctional Officer Patrick Conley struck him in the head with an ax handle.[32] This testimony was contradicted by Correctional Officers Conley and Bryan Huckeba, who attested that Morgan attacked Conley, and that they along with two other correctional officers used only that force necessary to subdue Morgan and return him to his cell. Conley denied that he was carrying an ax handle on that day. Subsequently, plaintiff Morgan pleaded guilty to a reduced charge of attempted assault that arose out of the August 15 incident.

 Morgan is collaterally estopped from denying that he instigated the clash with correctional officers that day. Be-

---

**31.** Judge Friendly looked to the due process clause to find a right on the part of prisoners to be free from the excessive use of force by prison officials. The Supreme Court recently indicated that "the [e]ighth [a]mendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,*

475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed. 2d 251 (1986). Substantively, however, the test to be applied remains that which Judge Friendly developed in *Johnson v. Glick. See* 475 U.S. at 320–21, 106 S.Ct. at 1084–85.

**32.** During the period in question, correctional officers charged with the responsibility of maintaining order in SHU often carried batons or ax handles in performing their duties.

cause the government is held to a higher burden of proof in criminal cases, a criminal defendant can be estopped from relitigating any issue decided against him in a criminal proceeding in a subsequent civil action, even when the government ostensibly is not a party in the latter action. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). A conviction of attempted assault precludes a finding that Morgan struck the correctional officers in self-defense that day, and mandates a conclusion that Morgan instigated the violent confrontation. *See* N.Y.Penal Law § 35.15(1) (McKinney 1987) (use of physical force in defense of self or third person is a defense to criminal charge of assault); *see also People v. Goetz*, 68 N.Y.2d 96, 105–06, 506 N.Y.S.2d 18, 24, 497 N.E.2d 41, 46–47 (1986). In any event, the court disbelieves Morgan's testimony concerning the August 15 incident, and finds credible the testimony of Conley and Huckeba to the effect that Morgan initiated the incident.

■■ A finding that an inmate initially attacked a prison guard, of course, does not preclude the possibility that the response to this attack by prison personnel was excessive and unreasonable. In the case at bar, the court fully credits the testimony of Conley and Huckeba and finds that the force used to subdue Morgan was not greater than necessary under the circumstances. The credible evidence indicates that as Officers Conley, Huckeba and Brooks were escorting Morgan back to his cell after showering, Morgan turned and struck Conley with his fist. The three officers present, quickly joined by Correctional Officer Miles Martin, tackled Morgan. Morgan resisted, thrashing about violently, until the officers were able to subdue him and carry him to his cell. During the course of this skirmish, Conley suffered a broken hand and Huckeba sustained a knee injury that disabled him for six months. Morgan, in contrast, suffered comparatively minor injuries to the eye and shoulder that did not require medical attention.

In sum, the court concludes that Morgan's unprovoked attack necessitated the application of force, that the force used was commensurate with the measure of force required by the circumstances, and that force was used in a good faith effort to restore order. Therefore, Morgan's excessive force claim is meritless.

### 2. The August 18, 1974 Incident Involving Plaintiff Goggins

■■ In his deposition testimony,[33] plaintiff Goggins stated that Correctional Officer Clarence Martin was harassing him as he was being taken to the showers on August 18, 1974, stepping on his heels and jabbing him in the back with an ax handle. Goggins attests that he turned

---

**33.** Plaintiff Goggins did not appear or testify at trial. The transcript of Goggins' deposition testimony was admitted into evidence under Fed. R.Civ.P. 32(a)(3)(B), which provides that

[t]he deposition of a witness, *whether or not a party,* may be used *by any party* for any purpose if the court finds ... that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition.

*Id.* (emphasis added). At the time of trial, Goggins resided in the New York City area, well over 100 miles from Auburn, New York, where this matter was tried. The Second Circuit's leading opinion on the admissibility of a party's deposition offered by that party himself is *Richmond v. Brooks*, 227 F.2d 490 (2d Cir.1955). In *Richmond,* the court found that the plaintiff had not "procured" her absence merely because she resided in another state and had not attempted to be present at trial, and having found this the court had no difficulty finding that the deposition at issue otherwise fell within the above-quoted Rule. *Id.* at 492–93. *Richmond* has been consistently followed in the few cases addressing the admissibility of a party's own deposition under the circumstances of the present case. *See, e.g., Nash v. Heckler,* 108 F.R.D. 376 (W.D.N.Y.1985); *Bellamy v. Molitor,* 108 F.R.D. 1 (W.D.Ky.1983); *Houser v. Snap–On Tools Corp.,* 202 F.Supp. 181 (D.Md.1962). This court followed this precedent and allowed plaintiffs to introduce Goggins' deposition into testimony. Nonetheless, it should be noted that in a case like this, where many of the key factual issues turn on the credibility of the witnesses, the inability of the court to observe the deposition witness's demeanor severely hinders its ability to fulfill its fact-finding responsibility.

around, and Martin tackled him to the ground. Martin began punching Goggins, and other officers began hitting his legs and ankles with ax handles. Goggins claims that Sergeant Sherry Dobbs approached the area in which this scuffle was occurring and sprayed tear gas [34] into Goggins' face.

This recount of the events surrounding the use of force incident involving Goggins is at odds with the testimony of defendants Dobbs and Clarence Martin. According to Martin, he and another correctional officer, Frank Woodward, were escorting Goggins to the showers when Goggins turned and grabbed Woodward. Woodward pushed Goggins to the ground and went down on top of the inmate. Goggins was then allowed back on his feet, and he ran back into his cell.[35] As the officers approached Goggins to close the hinged steel door of the inmate's cell, Goggins threw a blanket between the door and the door casing, preventing the door from being closed and secured. Defendant Dobbs testified that Goggins was ordered repeatedly to move to the front of the cell so that the guards could safely approach and remove the blanket. Goggins refused, and began throwing books and other objects against the cell wall. Dobbs then applied one short burst of tear gas to Goggins' face, causing Goggins to move away from the doorway and allowing the officers to remove the blanket and close the cell door.

Determining which of the contradictory versions of the August 18, 1974 incident to believe is complicated by the fact that the court was unable to observe Goggins' demeanor while he testified. The court does note, however, that throughout Goggins deposition, he denied responsibility for absolutely every offense—whether criminal or disciplinary—with which he has ever been charged. He denied committing the offense of which he was originally convict-

ed in 1970; he denied responsibility for a subsequent parole violation that landed him in prison a second time; he attributed the long list of disciplinary charges that he accumulated at Clinton to a conspiracy among prison guards and officials. In light of the distorted vision of reality such denials manifest, it is difficult for the court to give his version of the August 18 incident credence. Moreover, there was nothing in the demeanor or internal consistency of the testimony of either Martin or Dobbs which would make this court disbelieve them. Although some of the testimony differed in detail from the contemporaneous report that was prepared immediately after the incident, *see supra* note 35, none of the discrepancies fundamentally undermine the testimony given. The court accepts the account of the incident given by Martin and Dobbs.

The court concludes that the force used to subdue Goggins was neither unreasonable or excessive. Goggins attack on Woodward was met with force in kind, and it does not appear that serious physical injury resulted from the initial force applied by Woodward. The use of tear gas, which did cause significant short-term injuries in the form of gas burns to Goggins' eye, face, and back, was not excessive under the circumstances, because the inmate's failure to obey an order that was issued on several occasions presented a threat of physical harm to prison personnel. Therefore, the court concludes that Goggins has failed to establish that he is entitled to recover on his excessive force claim.

3. *The November 9, 1974 Incident Involving Plaintiff Born–Allah*

■ On November 9, 1974 prison officials conducted a search of each of the twelve cells in the gallery in which plaintiff Born–Allah was housed, attempting to lo-

---

**34.** During the period relevant to this lawsuit, it was not unusual for Lieutenants or Sergeants working in Clinton's special housing units to carry tear gas canisters if permission had been obtained from the institution's watch commander.

**35.** This account is not consistent with the Use of Physical Force report completed at the time of the incident. Exh. 12. That report indicates that Goggins initiated the altercation by swinging his fist at Woodward, and that Goggins resisted the officers as he was taken back to his cell.

cate a law book that had been loaned from the prison library to an inmate in that gallery. The book had not been found in the borrower's cell, and it was suspected that the book might have been passed from cell to cell within the gallery. Several of the cells in the gallery had been searched without incident when then-Sergeant (now Lieutenant) William Durnin and Correctional Officers Clifford Martin, James O'Brian, and Abe Brusso came to the cell occupied by Born–Allah. What transpired next is disputed.

Born–Allah testified that his memory of the incident was vague. He remembers that after he had been taken out of his cell, Officer Martin raised an ax handle threateningly and ordered the prisoner to "assume the position" so that the officers could conduct a pat-down search. Born–Allah recalls being hit by Martin and held by Durnin, claims he fell into unconsciousness, and was thrown back into his cell. As a result of this fracas, the inmate suffered injuries to his left elbow, left knee, and ribs, along with various contusions and bruises.

The account of the incident given by Officers Martin and Brusso and Lieutenant Durnin diverges with that of Born–Allah dramatically. According to the testimony of these correctional officers, Born–Allah was informed that a library book was missing and that a search of all of the cells in the gallery was being conducted. Under the procedures utilized at Clinton at that time, *see* Exh. T, the inmate whose cell was to be searched was required to exit the cell, move at least two doors away from his cell, and face a wall, placing both hands on the wall and spreading his legs. A pat-down search of that inmate was then conducted, followed by a search of the inmate's cell. Born–Allah refused to "assume the position" or submit to a pat-down search. As Durnin, Martin, and two other correctional officers approached Born–Allah after the inmate had twice ignored orders to assume the proper position against the wall, the inmate attacked, throwing punches and kicking out at the officers. The officers attempted to deflect Born–Allah's kicks with their batons. The inmate kicked Cor-

rectional Officer Martin with such force that Martin sustained a large bruise in the chest area and suffered a permanent partial disability to his right thumb. The officers present used their batons to force the inmate back into his cell.

Initially, the court notes that the search being conducted by prison officials on November 9, 1974 did not violate any of Born–Allah's constitutional rights. The search of the cells in the gallery did not implicate any rights protected by the fourth amendment. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Moreover, the pat-down search was supported by a reasonable suspicion that "crime was afoot," and thus was reasonable under all of the circumstances. *Compare Commonwealth v. Wallington*, 238 Pa.Super. 427, 357 A.2d 598 (1976) (a more intrusive search of twelve men in a cell upon discovery that $500 had been taken from a thirteenth man in the same cell was deemed reasonable).

With regard to the details of the November 9 incident, the court accepts the account of that episode offered by the prison guards who testified. On the witness stand, Born–Allah exhibited under effective cross-examination the combativeness and violent temper described in the testimony of Durnin, Martin and Brusso. The inmate revealed the ethical development of a seven-year old, indicating that one's manhood should be measured by his ability to dominate others physically and hinting that individual disputes are best settled by martial confrontation. The court finds little comfort in Born–Allah's assurance that he is "level-headed" when he is out-numbered and at a disadvantage. Further, the inmate's testimony to the effect that Martin, unprovoked, swung an ax handle "like a baseball bat" and struck him in the head with enough force to render him unconscious lacks credibility in light of the fact that he did not suffer severe injuries as a result of the November 9 incident. In short, the court rejects the testimony of Born–Allah concerning this use of force incident and finds that the credible evidence indicates that Born–Allah instigated

the confrontation, and that the use of force by Clinton's guards was justified under the circumstances.

Having found that the initial search was justified and that Born–Allah initiated the violence on November 9, 1974, the only question remaining is whether the force used to repel the inmate's attack was proportionate to the risk to the safety of the officers involved and the security of the institution. The court finds that it was. The evidence indicates that Born–Allah assumed a martial arts stance and began kicking at the officers with considerable power. The officers responded forcefully, as would be expected under the circumstances. The injuries actually suffered by the inmate—a sore left elbow and knee, sore ribs, and contusions to the head that did not require stitches—are not of the sort that would evidence that excessive force was used. The officers who testified concerning this incident related that Born–Allah was hit with batons and ax handles until he was driven back into his cell and secured. The court accepts this testimony, and finds that this was the degree of force necessary to restore order. Consequently, the court finds no merit in Born–Allah's excessive use of force claim.

### E. *The Strip Search Policy*

■ The most serious challenge to conditions within Unit 14 during the period relevant to this lawsuit involves Clinton's practice of routinely conducting visual body cavity searches of inmates housed in Unit 14 before and after leaving that unit.[36] For example, such searches would be conducted before and after an inmate engaged in contact visits with individuals from outside the prison, or before attending Adjustment Committee Proceedings. A policy mandating strip searches of this sort can be attacked as violative of the fourth amendment's prohibition of unreasonable searches and seizures, or as a cruel and unusual punishment forbidden by the eighth amendment. The court will address the fourth amendment implications of Clin-

ton's strip search policies in 1974 and 1975 under this sub-heading. The search policy will be considered along with other conditions of confinement within SHU in assessing plaintiffs' eighth amendment claims in the following section. *See* text, *infra* at 1055–56.

■ The fourth amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Its applicability "depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2591, 61 L.Ed. 2d 220 (1979) (citing cases). The inmates housed in SHU in 1974 and 1975 retained an expectation of privacy in their bodies that society "recognize[s] as 'reasonable,' " *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), and thus any governmental invasion of that privacy interest must also be "reasonable." *See, e.g., Hodges v. Stanley*, 712 F.2d 34 (2d Cir. 1983) (inmate held in administrative detention); *Hurley v. Ward*, 584 F.2d 609 (2d Cir.1978) (*Hurley I*) (inmates held in punitive segregation unit); cf. *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986) (pre-trial detainees), *cert. denied*, —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). To assess the reasonableness of an invasion of a privacy interest, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

In *Bell v. Wolfish*, the Supreme Court held that routine visual body cavity searches of a pre-trial detainee conducted *after* a contact visit by someone from outside the prison did not violate the detainee's fourth amendment rights, even in the absence of either probable cause or reasonable suspicion that the detainee possessed contraband. 441 U.S. at 558–60, 99 S.Ct. at

---

**36.** This practice was condemned by Judge Foley in *Frazier v. Ward, see* 426 F.Supp. at 1360–67, but plaintiffs have not argued that collateral estoppel, the applicability of which must be af-

firmatively shown, applies with regard to Judge Foley's findings on this issue. *See* text, *supra* at 1037.

1884–85. In reaching this conclusion, the Court purported to weigh "the scope of the particular intrusion [upon the detainee's personal rights], the manner in which [the search was] conducted, the justification for initiating [the search], and the place in which [the search was] conducted." *Id.* at 559, 99 S.Ct. at 1884. The Court emphasized that "the serious security dangers" associated with detention facilities and the ever-present threat that contraband could be smuggled into the facility justified routine body cavity searches, regardless of "the degree to which these searches may invade the personal privacy of inmates." *Id.* at 559–60, 99 S.Ct. at 1884–85; *cf. id.* at 547, 99 S.Ct. at 18 ("[T]he central objective of prison administration [is] safeguarding institutional security.").

The case at bar is distinguishable from *Bell v. Wolfish* in that the strip searches were conducted both *before* and after contact visits. Plaintiffs argue that because they were confined in Spartan cells without many of their personal belongings, the danger of smuggling something *out* of the prison was nonexistent, and thus the policy requiring strip searches before contact visits was unreasonable. This argument is persuasive, and is consistent with precedent within this Circuit preceding the Supreme Court's decision in *Bell v. Wolfish.* For example, in *Hurley I,* 584 F.2d 609, the Second Circuit found that the same sort of visual body cavity search policy at issue in the case at bar—subjecting inmates confined in the special housing units at maximum security prisons in the State of New York to routine strip searches before and after leaving the special housing unit—violated constitutional protections afforded those inmates. *Id.* at 611 (*aff'g on this point Hurley v. Ward,* 448 F.Supp. 1227 (S.D.N.Y.1978)). Judge Foley's decision in *Frazier v. Ward,* 426 F.Supp. at 1362–66, is in accord with *Hurley I.*[37] The Second Circuit's decision in *Hurley I* relied in part

upon its decision in *Wolfish v. Levi,* 573 F.2d 118 (2d Cir.1978), however, and that decision was subsequently reversed by the Supreme Court under the caption of *Bell v. Wolfish.* Thus, the question is whether *Hurley I* remains good law in the aftermath of that Supreme Court decision.

Although the question is a close one, this court believes that it does. In *Hurley I,* the Second Circuit reviewed the propriety of a preliminary injunction imposed by the district court, and the matter was remanded to the district court.[38] After conducting a full-blown trial on the merits, Judge Carter of the Southern District of New York considered the effect of *Bell v. Wolfish* on the preliminary determination of the reasonableness of routine body cavity searches that had been made. *Hurley v. Ward,* 549 F.Supp. 174, 186 (S.D.N.Y.1982) (*Hurley II*). Judge Carter concluded that such searches after contact visits were permissible, but that in "all other circumstances" body cavity searches absent some level of cause were deemed unreasonable. *Id.* Consequently, under Judge Carter's opinion in *Hurley II,* a body cavity search could not be conducted absent at least reasonable suspicion when an inmate left SHU for a contact visit. *Accord Frazier v. Ward,* 528 F.Supp. 80 (N.D.N.Y.1981) (denying motion for reconsideration); *Arruda v. Fair,* 710 F.2d 886, 888–91 (1st Cir.) (Maletz, J., dissenting), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983); *see also Hodges v. Stanley,* 712 F.2d 34, 36 (2d Cir.1983) (A *second* body cavity search of inmate conducted shortly after the first, even though he had been under continual escort between searches, may be unconstitutional); *Bono v. Saxbe,* 620 F.2d 609, 617 (7th Cir.1980) (*Bell* did not approve of strip searches after supervised non-contact visits absent some showing of particularized suspicion).

**37.** Both *Hurley I* and *Frazier v. Ward* are distinguishable from the case at bar in that in both cases there was evidence that the visual cavity searches were conducted in an abusive manner. There is no credible evidence of significant physical or verbal abuse in this case.

**38.** The circuit court affirmed the injunction that protected the named plaintiff individually but reversed the district court's decision to grant class-wide injunctive relief because a class had not been properly certified in that case.

Although the court finds that *Hurley I* is still good law, the court recognizes that there is strong authority to the contrary. For example, the majority opinion in *Arruda v. Fair* provides strong support for defendants' contention that the body cavity searches at issue in the present case did not violate plaintiffs' constitutional rights. 710 F.2d at 886–88. That case, like the case at bar, was instituted by an inmate of a maximum security prison housed in a special housing unit for disciplinary reasons. The majority indicated that there was even stronger justification for routine body cavity searches—even when inmates were leaving special housing and before any contact with the outside world—in cases involving the dangerous and troublesome prisoners confined in such units than was present in cases involving pre-trial detainees. *Id.* at 887. The First Circuit noted the problems associated with prison guards and other employees introducing contraband into a segregated unit, and concluded that "[d]espite the prisoner's relative isolation, someone, such as an untrustworthy prison employee, might place contraband in a cell at night for the prisoner to pass to others...." *Id.* at 888. Body cavity search policies similar to that at issue in *Arruda v. Fair* and the present case were condoned in *Goff v. Nix*, 803 F.2d 358, 370–71 (8th Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987), and *Campbell v. Miller,* 787 F.2d 217, 228 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986).[39] Given the extreme deference to those who administer penal institutions in combatting imagined security threats exhibited by the *Bell v. Wolfish* majority,[40] it is possible that these latter cases are more consistent with the Supreme Court's approach to the problems presented by Clinton's search policy of 1974 and 1975, and under those cases Clinton's policy would survive scrutiny. Nonetheless, Judge Carter's decision in *Hurley II* demonstrates that *Hurley I* can be reconciled with *Bell v. Wolfish,* and absent repudiation of this precedent by the Second Circuit, this court will follow it.

■ A determination that Clinton's search policy violated the fourth amendment, however, does not end the court's inquiry. Even if the strip search policy employed in 1974 and 1975 violated the fourth amendment, defendants are entitled to good faith immunity. In the period when Clinton's strip search policy was in force and thereafter, similar policies were withstanding scrutiny under the fourth amendment elsewhere. Those cases are listed in the margin.[41] In light of this

---

**39.** *Campbell* addressed a challenge to a policy requiring routine body cavity searches before an inmate would be allowed access to a prison law library. The primary focus of the constitutional attack in that case was the plaintiff's right of access to the courts, protected by the fourteenth amendment.

**40.** This extreme deference can be more fully appreciated by reading Justice Marshall's forceful dissent in *Bell v. Wolfish:*

> Not surprisingly, the Government asserts a security justification for [the visual body cavity searches]. These searches are necessary, it argues, to prevent inmates from smuggling contraband into the facility. In crediting this justification despite the contrary findings of the two courts below, the Court overlooks the critical facts. As respondents point out, inmates are required to wear one-piece jumpsuits with zippers in the front. To insert an object into the vaginal or anal cavity, an inmate would have to remove the jumpsuit, at least from the upper torso.... Since contact visits occur in a glass-enclosed room and are continuously monitored by corrections offi-

cers, ... such a feat would seem extraordinarily difficult. There was medical testimony, moreover, that inserting an object into the rectum is painful and "would require time and opportunity which is not available in the visiting areas," ... and that visual inspection would probably not detect an object once inserted.... Only by blinding itself to the facts presented on this record can the Court accept the Government's security rationale.

441 U.S. at 577–78, 99 S.Ct. at 1894 (Marshall, J., dissenting) (citations omitted).

**41.** *See, e.g., Arruda v. Fair,* 710 F.2d 886 (1st Cir.1983) (routine body cavity searches conducted before and after maximum security prisoner visited law library or received visitors in visiting rooms did not violate fourth amendment); *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.) (body cavity search conducted before transfer to custody of United States Marshals for transportation to court upheld), *cert. denied,* 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Bell v. Manson,* 427 F.Supp. 450 (D.Conn.1976) (court, in denying preliminary injunction, finds routine strip searches of pretrial detainees upon return

substantial body of authority, the court finds that defendants are immune from liability so far as plaintiffs can argue that the searches conducted violated the fourth amendment. *Compare Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 210–11 (2d Cir.1984) (high correctional officials entitled to qualified immunity from liability for damages sustained as result of unconstitutional policy of conducting random body cavity searches of prison guards).

### F. *Conditions of Confinement*

■ Plaintiffs also claim that other conditions within Unit 14 during the time relevant to this lawsuit were so poor that the eighth amendment's prohibition against cruel and unusual punishment was violated. The eighth amendment mandates that prison conditions "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting punishment." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed. 2d 59 (1981). The inquiry to be made is whether prison conditions are such that they "deprive inmates of the minimal civilized measure of life's necessities." *Id.* Not all deprivations, therefore, give rise to eighth amendment concerns; "instead, the deprivations that trigger [e]ighth [a]mendment scrutiny are deprivations of essential human needs." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 836 (D.C.Cir.1988) (emphasis omitted). The eighth amendment is implicated, for example, when inmates are denied "essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased. *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. The eighth amendment is not violated merely because conditions are austere or desolate; "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. at 2399.

■ Plaintiffs have failed to demonstrate that conditions within SHU elicit the degree of outrage contemplated by the eighth amendment. The complaint's allegation that the inmates in SHU were denied needed medical care is unsupported by the evidence introduced at trial. None of the plaintiffs were denied medical attention unless they refused it; there is no evidence that Clinton's officials were deliberately indifferent to the medical needs of the inmates housed in Unit 14, nor that plaintiffs suffered either short-term or long-term injuries attributable to inadequate medical care. The related allegation that prison officials drugged the food of the inmates housed in Unit 14 lacks credibility.[42] No plausible foundation for plaintiffs' suspicion that they were being drugged by prison officials against their will was established.

■ Although plaintiffs complain of the use of noxious gases such as tear gas by authorized correctional personnel, in each of the incidents described at trial in which tear gas was used, such use was

---

to detention center from court constitutional), *rev'd*, 590 F.2d 1224 (2d Cir.1978); *see also Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D. N.Y.1975); *Bijeol v. Benson*, 404 F.Supp. 595 (S.D.Ind.1975); *Penn El v. Riddle*, 399 F.Supp. 1059 (E.D.Va.1975); *compare Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976) (policy of maximum security prison requiring visual body cavity search when inmate enters or leaves prison or following contact visit with person from outside prison is constitutional, but policy requiring such searches after returning from segregated exercise yard deemed unconstitutional absent "reasonably clear indication" that inmate is concealing something).

**42.** The drowsiness plaintiffs claim resulted from this involuntary drugging is not evidence of the "wanton and unnecessary infliction of pain" required by *Rhodes*, and thus plaintiffs allegations concerning forcible medication, even if true, would not state a claim under the eighth amendment. Nonetheless, the right to refuse medical treatment does have a constitutional dimension, "whether termed a liberty interest protected by the [d]ue [p]rocess [c]lause, or an aspect of the right to privacy contained in the notions of personal freedom which underwrote the Bill of Rights." *United States v. Charters*, 829 F.2d 479, 491 (4th Cir.1987). The court's rejection of plaintiffs' testimony regarding the involuntary administration of drugs forecloses recovery under either constitutional theory in this case.

justified under the circumstances. The moderated use of chemical agents such as tear gas or mace is permissible if necessary to control an inmate who threatens the safety of the guards or other prisoners or endangers the general security of the prison, and tear gas may be used in situations where there is a need to move a rebellious inmate. *See, e.g., Spain v. Procunier*, 600 F.2d 189 (9th Cir.1979); *Landman v. Peyton*, 370 F.2d 135 (4th Cir.1966), *cert. denied*, 385 U.S. 881, 87 S.Ct. 168, 17 L.Ed.2d 108 (1968); *Collins v. Ward*, 652 F.Supp. 500 (S.D.N.Y.1987). The credible evidence introduced at trial indicates that tear gas was used only when an inmate attacked a guard or when a recalcitrant inmate refused to move under circumstances where that refusal posed the threat of a physical confrontation.

■ Plaintiffs testified that they were subjected to various forms of mental abuse by prison guards in a deliberate attempt to humiliate and degrade them. For example, plaintiffs Morgan and Born–Allah both testified that Clinton's correctional officers would place cardboard nametags over their cells which contained such insulting phrases as "Monkey" and "Don't Feed the Animals." Morgan asserted that the guards in SHU required inmates in Unit 14 to "bark like dogs" before allowing them to shower. The testimony of plaintiffs with regard to the derisive nametags and the "barking" episodes lacks credibility. The placing of nametags over the cells ("cages") of the inmates in Unit 14 may have made those inmates feel as if they were being treated like "animals in a zoo," as one prisoner testified, but the court does not credit the testimony of Born–Allah and Morgan to the effect that prison personnel affirmatively drew attention to the parallel by writing the names of animals on nametags and placing those tags over the inmates' cells. Further, no reference to incidents where prison guards required inmates housed in SHU to "bark like dogs" was made in the deposition taken from Morgan prior to trial. These supposed incidents were central to his testimony concerning

the allegedly dehumanizing conditions in Unit 14, and it seems unlikely that they would be ignored when depositions were taken.

■ Morgan and Born–Allah also testified that the guards hurled racial epithets [43] at them. The court does not for a moment doubt that Clinton's guards used abusive language, including racial slurs, in addressing the institution's inmates in 1974 and 1975. But this alone does not support a viable eighth amendment claim. The realities of a maximum facility correctional institution are far removed from "the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d at 1033, and the court is fully aware that the exchange of verbal insults between inmates and guards is a constant, daily ritual observed in this nation's prisons. The court does not condone this; it merely recognizes that racial insults do not deprive prisoners of the "minimal civilized measure of life's necessities," and thus do not constitute an eighth amendment violation. *Williams v. Pecchio*, 543 F.Supp. 878, 879–80 (W.D.N.Y.1982); cf. *McFadden v. Lucas*, 713 F.2d 143, 147 (5th Cir.1983) (eighth amendment claim of excessive force cannot be maintained absent allegation of "physical abuse"), *cert. denied*, 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983); *Johnson v. Glick*, 481 F.2d at 1033 & n. 7 (constitutional protection of prisoners not so extensive as common law tort of assault, and "[e]ven at common law 'mere words, however violent, are held not to amount to an assault.' ").

■ Finally, the court does not find that Clinton's body cavity search policy violated the eighth amendment. The record does not support a conclusion that this policy was instituted with the intention of punishing inmates housed in Unit 14. "[T]he determination whether [certain] restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Bell v. Wolfish*,

---

**43.** Morgan, Goggins and Born–Allah are black.

441 U.S. at 561, 99 S.Ct. at 1886. In the present case, the State's interest in ensuring institutional security was a legitimate nonpunitive objective, and the policy at issue was rationally related to that purpose, even if it was offensive to the fourth amendment rights of the prisoners affected by the body cavity search policy. *See id.* Conduct not properly deemed punishment does not violate the eighth amendment absent "obduracy and wantonness." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084. There is no credible evidence of such wantonness here. In this respect, the case at bar is distinguishable from *Frazier,* in which Judge Foley concluded that a body cavity search that was "conducted in a debasing manner and not for any genuine security purposes" constituted a cruel and unusual punishment violative of the eighth amendment. 426 F.Supp. at 1366.

■ Plaintiffs failed to present credible evidence of other conditions within SHU that either singly or in combination offended the eighth amendment.[44] Prisons quarter those members of society who have "demonstrated their inability to control and conform their behavior to the legitimate standards of society." *Soto v. Dickey,* 744 F.2d 1260, 1267 (7th Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985). Those who bear the responsibility for administering our prisons must control those who cannot control themselves, "'at best an extraordinarily difficult undertaking.'" *Hudson v. Palmer,* 468 U.S. at 527, 104 S.Ct. at 3200 (quoting *Wolff v. McDonnell,* 418 U.S. at 566, 94 S.Ct. at 2979). Consequently, a highly regimented environment exists within maximum security facilities like Clinton. Regimentation by its nature discourages individual expression and diminishes an individual's sense of dignity. These are unfortunate but unavoidable consequences of "the interest of society in the security of its penal institutions." *Hudson v. Palmer,* 468 U.S. at 527, 104 S.Ct. at 3201. Imprisonment entails a significant loss of rights. *Id.* at 524, 104 S.Ct. at 3199. The evidence presented at trial did not establish that the rights plaintiffs retained were violated by the conditions of confinement in Unit 14 in 1974 and 1975.

### III. CONCLUSION

■ Judgment is granted in favor of plaintiff Morgan on his procedural due process claim against defendants Ward, LaVallee, and Fuller, and Morgan is awarded $1 in nominal damages and attorney fees. Judgment is granted in favor of plaintiff Born–Allah on his procedural due process claim against defendants Ward, LaVallee, and Fuller, and Born–Allah is awarded $750 in compensatory damages and attorney fees. Plaintiffs Morgan and Born–Allah are directed to file and serve their fee application on or before November 23, 1988. Objections, if any, should be filed and served on or before December 2, 1988. Oral argument on the fee application will be made at the December 16, 1988 motion term in Syracuse, New York. Judgment is granted in favor of defendants on all remaining claims made in this lawsuit. The Clerk of the Court is directed to enter judgment accordingly.

It is So Ordered.

---

44. In addition to their other challenges to the conditions of confinement within Unit 14, plaintiff's complaint alleged that defendants violated plaintiffs' rights of free exercise of religion. The evidence presented at trial was too sparse to support those claims.